

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LESLIE BEATRICE DOBSON,        )
                               )
            Plaintiff,          )
                               )
v.                             )        1:12-cv-00946 (IDD)
                               )
CAROLYN W. COLVIN,             )
Acting Commissioner of Social Security,  )
                               )
            Defendant.          )
_____)

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 15). Pursuant to 42 U.S.C. § 405(g), Leslie Beatrice Dobson ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant") denying Plaintiff's claim for disability insurance benefits ("DBI") and supplemental security income ("SSI") under sections 216(i) and 223 of the Social Security Act ("Act"), 42 U.S.C. § 405(g). For the reasons stated below, the undersigned Magistrate Judge finds that the Commissioner's decision is supported by substantial evidence, and that there is no evidence warranting remand. Accordingly, the Court grants Defendant's Motion for Summary Judgment.

## I.    PROCEDURAL BACKGROUND

On June 30, 2009, Plaintiff filed an application for DBI and SSI alleging she had been unable to work since March 15, 2007, due to disability arising from obesity, back and hip problems, diabetes, and asthma. (Administrative Record "AR" 127-39, 159.) The Social Security Administration denied Plaintiff's initial claim on October 29, 2009. (AR 67-79.) The Social Security Administration denied Plaintiff's claim again upon reconsideration on May 14,

1

2010.   (AR 62-65, 83-86.)   On July 19, 2010, Plaintiff requested a hearing before an administrative law judge ("ALJ").   (AR 87-88.)   ALJ C.J. Sturek granted Plaintiff's request and held a hearing on May 10, 2011.   (AR 26-56.)

On June 13, 2011, the ALJ issued a decision denying Plaintiff's claim, finding that Plaintiff was not disabled within the meaning of the Act.   (AR 8-25.)   Plaintiff requested a review of the ALJ's decision, and on June 30, 2012, the Appeals Council denied the request. (AR 1-6.)   The Appeals Council's denial of Plaintiff's request rendered the ALJ's decision the final decision of the Commissioner for purposes of review under 42 U.S.C. § 405(g).

On August 24, 2012, Plaintiff filed the instant suit in this Court, challenging the ALJ's decision.   (Dkt. No. 1.)   After both parties consented to the jurisdiction of the undersigned Magistrate Judge on April 11, 2013 (Dkt. No. 12), this Court issued an Agreed Order that: Defendant file an answer and the administrative record on March 19, 2013; Plaintiff file a motion for summary judgment on May 20, 2013; and Defendant file an opposition to Plaintiff's motion combined with Defendant's cross motion for summary judgment on June 21, 2013 (Dkt. No. 14). Plaintiff failed to file a motion for summary judgment,[1] but Defendant filed the instant Motion for Summary Judgment on June 21, 2013.   (Dkt. No. 15.)   Thus, this matter is ripe for disposition.

## II.   FACTUAL BACKGROUND

Plaintiff was born on March 7, 1963, and was forty-four years old as of March 15, 2007, the date Plaintiff alleges she became unable to work.   (AR 127, 133.)

---

[1] Plaintiff's failure to respond, alone, does not fulfill the burdens imposed on moving parties by Rule 56(c).  Fed. R. Civ. P. 56(c).  Although a party's failure to respond to a summary judgment motion may leave facts established by the moving party uncontested, the moving party must still show that such facts entitle the party to "a judgment as a matter of law."  See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (noting that the court must still review the unopposed motion on the merits to determine if summary judgment is appropriate); see also Fed. R. Civ. P. 56(e) (stating that summary judgment should be entered only if appropriate against the adverse party, rather than as a default).

### A.   Academic and Employment History

Plaintiff's academic background includes four or more years of college.[2] (AR 165.)

Plaintiff's employment history includes positions in customer service, as a referral specialist at a

doctor's office, and as a self-employed child care provider. (AR 167, 242.)

### B.   Residual Functional Capacity

On March 22, 2009, Plaintiff completed a "Function Report - Adult" form. (AR 146-53.)

Plaintiff reported that she lived in an apartment with her family and did not need any special

reminders to take care of her personal needs and grooming. (AR 146-47.) She noted that she

was able to handle her finances and prepared meals daily. (AR 147, 149-50.) Plaintiff's

daughter completed most of the household chores. (AR 149.) Plaintiff also noted that she read

and listened to music. (AR 150.) She took afternoon naps. (AR 146.) She traveled by riding in

a car, using public transportation, or walking. (AR 149.) She shopped for food, toiletries, and

personal items monthly. (*Id.*) She regularly visited her friends. (AR 150.) She had no problems

getting along with authority figures, family, friends, neighbors, and others. (AR 151-52.)

Plaintiff reported that her condition had not affected her memory, completing tasks,

concentration, attention, understanding, following instructions, or using her hands. (AR 151.)

She reported no problem handling changes in routine. (AR 152.) She finished what she started

such as reading and watching a movie. (AR 151.)

On July 24, 2009, Plaintiff submitted a second "Function Report – Adult" form. (AR

181-88.) Plaintiff reported no change in her daily activities (AR 146-50, 181-85), and stated that

her condition did not affect her memory, completing tasks, concentration, attention,

understanding, following instructions, getting along with others, handling changes in routine, or

---

[2] Plaintiff's testimony before the ALJ clarified that Plaintiff dropped out of college during her senior year, and did not complete her course of study. (Administrative Record "AR" 34.)

using her hands. (AR 151-52, 186-87.) Finally, she noted that she did not use an assistive device or wear a brace/splint. (AR 187.)

On February 24, 2010, Plaintiff completed a third "Function Report – Adult" form. (AR 211-18.) Plaintiff reported that she lived with her daughter and granddaughter. (AR 212.) Plaintiff contended that she had constant chronic pain, which defined how she spent her day. (AR 212.) Plaintiff wrote that most of the time she had to lay across the bed to feed herself. (AR 211.) She still traveled by riding in a car, using public transportation, or walking. (AR 214.) She continued to shop once a month. (*Id.*) She reported no significant change in her functional abilities. (AR 216-17.) Finally, Plaintiff reported that she still did not use an assistive device or wear a brace/splint, but believed that a cane would be of assistance. (AR 217.)

At Plaintiff's hearing, Plaintiff further averred that she did not do any household chores, except folding laundry and cooking by warming food in the microwave. (AR 45.) Plaintiff testified that she primarily spent her day watching television or reading, and she was able to pay attention and finish such tasks. (AR 45, 46.) She denied having memory problems. (AR 46.) She noted receiving food stamps, but contended that she could not afford the proper type of food. (AR 46.) She stated that she tried to avoid lifting, but could take items off the shelves while grocery shopping. (AR 40-41.) She reported that she had problems with her hand grip, some numbness in her hands, and uncontrollable shakes in her hands, but that she could put on and take off her earrings by herself and write using a pen or a pencil. (AR 42.) She noted that she previously wore a splint on her left wrist for about eight months. (AR 44.) She could raise her right arm overhead, but it hurt to raise her left arm.[3] (AR 43.) She napped during the day for one or two days a week. (AR 44-45.)

---

[3] Plaintiff did not injure her left arm as far as she knew. (AR 44.)

## C.     Vocational Opportunities

An impartial vocational expert, Dr. James Ryan, also testified at the hearing (AR 37-38, 51-54, 119.) The ALJ posed a hypothetical about the availability of unskilled sedentary work for an individual who:

> was between the ages of forty-four and forty-eight years old, had [Plaintiff's vocational profile]; had the ability to lift less than ten pounds frequently and ten pounds on occasion; had the ability to walk or stand less than two hours, with normal breaks, in an eight hour day; had a limitation with regard to pushing and pulling with the nondominant [sic] upper extremity as well as both lower extremities; would be unable to do work that involved any use of ladders, ropes, scaffolds or crawling; could occasionally climb stairs and ramps, balance, bend, stoop, kneel, crouch and squat; had a limitation in occasionally reaching overhead; had a limitation regarding feeling in both hands; had to avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, gases, and poor ventilation and hazards such as moving machinery and unprotected heights; could not do any driving because the individual did not have a driver's license;[4] and due to a combination of pain, fatigue and medication side-effects had a moderate[5] limitation to keep up a pace.

(AR 51-52.)

Dr. Ryan responded that such an individual could not perform her past relevant work, but could perform 25% of the 200 unskilled sedentary occupations recognized in the medical vocational guidelines. (AR 52-53.) Additionally, Dr. Ryan provided two examples of unskilled sedentary occupations such as a charge account clerk or a security officer. (*Id.*) Dr. Ryan concluded that there are 26,000 jobs nationally and 650 locally for a charge account clerk and 37,000 jobs nationally and 820 locally for a security officer.

## D.     Medical History

On February 26, 2008, Plaintiff underwent a series of radiology examinations. (AR 238-40.) Her lumbar spine x-ray revealed degenerative changes at L5-S1 along with some narrowing

---

[4] Her driver's license was suspended due to unpaid fines. (AR 33.)

[5] The ALJ explained that "moderate" meant more than a slight limitation but able to function satisfactorily during the eight hour workday. (AR 52.)

of the joint space and hypertrophic spurring. (AR 238.)   The remainder of Plaintiff's lumbar spine was unremarkable. (AR 238.)   Her chest and right hip x-rays revealed no acute process. (AR 239-40.)

On March 22, 2008, Plaintiff saw Mohammad Akbar, M.D., who conducted a consultative examination of Plaintiff. (AR 241-48.)   Plaintiff complained of: "off and on" back pain that had recently begun radiating to her right thigh area; falling multiple times; and pain in her right shoulder which made it difficult to lift heavy objects. (AR 241.)   She reported a history of asthma and diabetes for "many years," along with a history of hypertension and hyperlipidemia. (AR 241-42.)   Plaintiff stated that due to multiple problems, her activity level decreased and she gained approximately 100 pounds in the past two years.[6] (AR 241.)   She reported mild tenderness in her occipital area, but denied any headache. (AR 242-43.)   Her cardiac exam revealed a regular rhythm, with no murmur or ectopy appreciated.   (AR 243.)   Plaintiff had expiratory wheezes, but no crackles were noted in her lungs. (AR 243.)   She underwent spirometry testing which indicated that her condition improved with the use of a bronchodilator. (AR 245-46.)   She reported tenderness and exhibited decreased range of motion in her lumbosacral area, but there was no erythema. (AR 243, 248.)   She exhibited full range of motion in her left upper extremity, with 5/5 strength and no muscle atrophy. (AR 243, 247-48.)   She reported tenderness in her right shoulder area, with decreased extension and rotation of the joint. (AR 243, 248.)   She had 4/4 strength in her right upper extremity. (AR 247.)   She reported tenderness in both hips, but there was no muscle atrophy. (AR 243.)   She had 4/5 strength in her lower extremities. (AR 247.)   Her reflexes were 2+. (*Id.*)   Her distal pulses were intact in all extremities. (AR 243.)   However, Plaintiff reported mild sensory changes in her feet area, which Dr. Akbar believed may be attributable to diabetes. (AR 243.)   Plaintiff's tandem

---

[6] At her examination, Plaintiff was five feet and two inches tall, and she weighed 310 pounds. (AR 242.)

gait was normal, but her ability to walk on her toes and heels and hop were abnormal. (AR 247.) Her standing was normal, but her ability to stand on one foot was abnormal. (*Id.*)

On February 28, 2009, Plaintiff visited Potomac Hospital's Family Health Connection and reported increased glucose levels, and complained that she hurt "all over," and had a yeast infection. (AR 265.) Plaintiff saw Evelyn Marr, F.N.P. (*Id.*) Ms. Marr noted that Plaintiff had run out of all of her medication, but was in no distress. (*Id.*) Her medication regimen was restarted. (*Id.*) On March 2, 2009, Ms. Marr informed Plaintiff that Plaintiff's laboratory study revealed that Plaintiff had a high cholesterol level. (AR 294.)

On March 10, 2009, Plaintiff sought emergency room treatment complaining of chest pain, nausea, and a knot in her stomach. (AR 266-76.) Plaintiff was admitted for evaluation. (AR 268.) Her physical exam, neurologic exam, chest x-ray, and CT of her abdomen were unremarkable. (*See* AR 268-70.) Her neurologic exam was unremarkable. (AR 268.) Mild degenerative changes were noted of Plaintiff's lower lumbar spine. (AR 270.) Her abdominal ultrasound revealed mild hepatomegaly, but was within normal limits. (AR 264, 270.) Plaintiff was discharged on March 12, 2009. (AR 206.)

On April 9, 2009, Plaintiff returned to Potomac Hospital and met with Ms. Marr. (AR 264, 455.) Plaintiff reported that she felt much better, but she complained that she was wheezing and needed an inhaler. (AR 264.) Plaintiff reported that she was out of all of her medications, including having not picked up her insulin. (*Id.*) Ms. Marr noted that Plaintiff's diabetes was under poor control. (*Id.*) Plaintiff's medication was re-started. (*Id.*)

On May 19, 2009, Plaintiff returned to Potomac Hospital for monitoring of her diabetes and hypertension. (AR 262, 454.) Ms. Marr told Plaintiff to continue all of her medication and

to limit her intake of sweets. (AR 262.) On June 15, 2009, Plaintiff returned to Potomac Hospital to receive sample medication. (AR 263, 453.)

On July 13, 2009, Plaintiff returned to Potomac Hospital because she felt a "pop" in her left knee while she was at the pool with her grandchildren. (AR 263, 451.) She reported that she subsequently developed pain in her knee and had experienced difficulty walking. (AR 263.) She took an ibuprofen, which she said helped with her "aches & pains." (*Id.*) She exhibited full range of movement in her left knee, with no redness or warmth and mild swelling; there was no ligamentous laxity; and she had strong distal pulses. (*Id.*) Ms. Marr applied an ace bandage to Plaintiff's knee for a knee sprain. (*Id.*) Ms. Marr told Plaintiff to avoid sweets and adhere to her diet for glucose control because of her diabetes. (*Id.*)

On August 10, 2009, Plaintiff returned to Potomac Hospital. (AR 261, 449.) She reported an episode of a "low" glucometer reading two days before, and that she felt "bubbles" around her breast the day before. (AR 261.) She was out of insulin, and therefore, her diabetes was not controlled. (*Id.*) Her chest exam was positive for gas. (*Id.*) Her medication was refilled. (*Id.*)

On October 29, 2009, William Amos, M.D., a physician consultant who worked with the State agency, reviewed Plaintiff's file. (AR 299-304, 308-13.) Dr. Amos concluded that Plaintiff's diabetes, obesity, asthma, and osteoarthrosis did not prevent her from engaging in light work that involved lifting twenty pounds occasionally and ten pounds frequently; standing and/or walking and sitting about six hours each in an eight-hour workday; pushing and/or pulling within her lifting and/or carrying ability; no climbing of ladders, ropes and scaffolds; occasionally climbing ramps and stairs, kneeling, crouching, and crawling; balancing and stooping frequently; and avoiding concentrated exposure to fumes, odors, gases, and poor

ventilation. (AR 299-302.) Dr. Amos observed that the medical evidence showed no significant muscle weakness or loss of control due to nerve damage. (AR 303.) Dr. Amos concluded that Plaintiff's motor exam was intact, and her CT revealed only mild degenerative changes of her lumbar spine. (AR 299.) Dr. Amos further noted that Plaintiff's self-assessment statements to him were only partially credible because some of her limitations were not supported by the evidence and Plaintiff had a history of noncompliance with medical advice for her diabetes. (AR 300.) There was also no evidence of severe damage to Plaintiff's vital organs due to diabetes. (AR 303.) Her asthma attacks were infrequent and controlled by prescription medication. (*Id.*)

On November 17, 2009, Plaintiff visited Potomac Hospital, complaining of numbness in her toes and shins. (AR 443, 447.) She said that her blood glucose levels were usually "pretty good." (AR 443.) She also felt that she may be depressed after losing a recent court case and her home, and ending a personal relationship. (*Id.*) She denied having suicidal thoughts. (*Id.*) Lastly, she wanted "stomach" medicine. (*Id.*) On examination, she reported decreased sensation in her feet, but her pulses were strong. (*Id.*) Ms. Marr adjusted Plaintiff's medication. (*Id.*)

On December 9, 2009, Plaintiff received a note from Ms. Marr which indicated that the CT scan of her abdomen and pelvis suggested that she had arthritis in her low back (i.e., end plate degenerative changes at the L5-S1 level), but the scan was otherwise normal. (AR 424.) Plaintiff's stool was negative for gastritis bacteria. (*Id.*) Her kidney and liver functions were normal and her stool and urine samples revealed that she was not anemic. (*Id.*)

On December 22, 2009, Plaintiff again went to Potomac Hospital for treatment; treatment records indicated that her diabetes and hypertension were uncontrolled because of non-compliance with her treatment regimen. (AR 421.) Her medication was refilled, and hospital personnel provided Plaintiff with the telephone number of a church that could provide funds for

her medication. (*Id.*) On February 4, 2010, Plaintiff returned to Potomac Hospital for continued pharmacy assistance. (AR 417.) She reported that she had not followed up with the church or other community resources to provide assistance with her medication. (AR 421.) Hospital personnel noted that Plaintiff continued to be non-compliant with treatment. (AR 417.)

On March 4, 2010, Plaintiff returned to Potomac Hospital for continued monitoring of her condition. (AR 416.) On March 8 and May 26, 2010, Plaintiff contacted Potomac Hospital for pharmacy assistance. (AR 412, 414-15.) On May 27, 2010, Plaintiff followed up at Potomac Hospital, complaining that all of her joints hurt and that she felt that her heart was "spitting." (AR 412.) Plaintiff's physical exam was negative except for her report of tenderness in her right hip and left knee. (*Id.*) She was sent for x-rays. (AR 399-401, 412.) The x-ray of her right hip revealed no fracture or dislocation; no focal lytic lesions; and symmetrical joint spaces in her hips. (AR 401.) The x-ray of her left knee revealed no recent fracture or dislocation. (AR 400.) There were degenerative changes with bony spurs in her medial lateral and patellofemoral compartments, but there was no significant effusion or focal lytic lesions. (*Id.*) The x-ray of her left wrist showed no recent fracture or dislocation. (AR 399.) There were degenerative changes with bony spurs in her first carpometacarpal and first metacarpophalangeal joints. (*Id.*) Her laboratory studies showed that her kidney and liver were normal, although her blood glucose level was high. (AR 396.)

On May 1, 2010, Ericka Young, D.O., conducted a consultative physical examination of Plaintiff. (AR 314-18.) Dr. Young reported that Plaintiff's records indicated that she had a history of mild degenerative joint disease of her lumbar spine, uncontrolled diabetes, hemorrhoids, a left knee sprain, dyslipidemia, and obesity. (AR 314.) Plaintiff had no peripheral artery disease. (*Id.*) She reported that her asthma was controlled on medication, and she had

never required hospitalization or intubation for asthma. (*Id.*) Plaintiff noted that she did light cooking and cleaning, and could perform daily living activities such as getting herself dressed. (*Id.*) Dr. Young observed that Plaintiff carried a "very heavy" purse that weighed at least ten to fifteen pounds. (AR 316.) Dr. Young reported that Plaintiff exhibited a normal mood and affect. (AR 315.) Plaintiff demonstrated adequate thought processing ability and memory and adequate fund of knowledge. (*Id.*) Dr. Young noted that Plaintiff was obese and exhibited a stiff, waddle-like gait; however, she did not need to use an assistive device. (*Id.*) She exhibited a slightly increased expiratory phase, but there were no wheezes, or rhonchior rales. (*Id.*) Her cardiac exam revealed a regular rate and rhythm, with no murmurs, rubsor gallops on auscultation. (AR 315.) There was no cyanosis, clubbing, or edema of her extremities, and her distal pulses were intact. (*Id.*) Her coordination was intact on finger-to-nose and heel-to-toe testing. (AR 315, 317.) She was unable to walk on her toes and heels and hop, and she exhibited an abnormal arm swing and tandem gait. (AR 315.) Her station was normal. (AR 317.) Plaintiff's cervical and thoracolumbar spine and hips range of motion was abnormal, but Dr. Young observed that Plaintiff displayed poor effort with range of motion testing on the exam. (AR 315-16, 318.) Otherwise, Plaintiff's range of motion was normal with her shoulders, elbows, knees, ankles, wrists, and fingers. (AR 318.) Plaintiff's straight leg raising test was negative. (AR 316.) There was a slight increase in iliopsoas muscle spasm in her lumbar spine, but her lordotic curve was normal. (*Id.*) Her neurologic exam revealed she had 5/5 muscle and grip strength and manual dexterity (AR 316-17); she was able to open a screw top bottle cleanser (AR 316). Her reflexes were intact. (AR 316-17.) Dr. Young concluded that Plaintiff could perform a wide range of light work. Plaintiff could: occasionally lift twenty-five pounds and frequently lift and carry twenty pounds; stand or walk about six hours in an eight hour workday, although she

11

needed occasional breaks to rest her back and feet; sit without restrictions; frequently bend and occasionally stoop and crouch; but, could not climb. (AR 316.) Finally, Dr. Young concluded that Plaintiff had to use a cane on uneven terrain but, otherwise, did not need to use an assistive device and did not have any manipulative limitations. (*Id.*)

On May 14, 2010, Luc Vinh, M.D., a physician consultant who worked with the State agency, reviewed Plaintiff's file. (AR 324-28, 330, 336-40, 342.) Dr. Vinh independently concluded that Plaintiff's diabetes, obesity, asthma, osteoarthritis and allied disorders, degenerative disc disease, and essential hypertension did not prevent her from performing light work. (AR 315, 327-28.) Plaintiff could occasionally lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours and sit about six hours in an eight-hour workday; push and/or pull within her lifting and/or carrying ability; never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs, crouch and crawl; frequently balance and stoop; had no manipulative limitations; and needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (AR 327-28.) Dr. Vinh determined that Plaintiff was only partially credible and that her professed daily activity limitations were not supported by the totality of the evidence. (AR 326.) Dr. Vinh also concluded that Plaintiff had a history of noncompliance with medical advice for her diabetes. (*Id.*) Dr. Vinh independently concluded that the need to use a cane on uneven terrain was an overestimate of Plaintiff's limitations and unsupported by the record. (AR 326, 328.) Dr. Vinh noted that Plaintiff's asthma was controlled on medication. (AR 330.) Finally, Dr. Vinh concluded that while Plaintiff was obese and complained of joint pain, she was able to move about and use her arms and hands in an effective manner. (*Id.*)

On June 17, 2010, Ms. Marr contacted Plaintiff for counseling because her blood glucose level was not well controlled. (AR 390, 393-94.) Ms. Marr suggested that Plaintiff find another provider who could care for her better given her compliance issues. (AR 390.) Plaintiff then admitted that she consumed alcohol even though Ms. Marr told her that she needed to decrease her alcohol intake. (AR 390.) Plaintiff said she would limit her alcohol intake going forward. (*Id.*) She also conceded that she ate "a lot" of chocolate daily, and she promised to wean herself off of chocolate. (*Id.*) Finally, Plaintiff said she would limit her intake of carbohydrates and walk daily. (*Id.*)

On September 16, 2010, Plaintiff visited Potomac Hospital complaining of a burning sensation in her left wrist and forearm and chronic discomfort in her left knee. (AR 384, 387.) She reported being out of her diabetes medication for two days. (AR 384.) Ms. Marr diagnosed Plaintiff with left forearm tendonitis, and referred her to the Free Clinic for an orthopedic consultation. (*Id.*) Plaintiff also completed an application for medication access and noted that she had never applied for Medicaid.[7] (AR 389.)

On November 14, 2010, Plaintiff sought pharmacy assistance from Potomac Hospital. (AR 373, 375.) On December 2, 2010, Plaintiff followed up at Potomac Hospital. (AR 373-74.) Plaintiff cried, and told Ms. Marr that she constantly slept and would be homeless by the end of the month. (AR 373.) She complained that her vision was blurry, she had headaches, and she felt off balance. (*Id.*) She denied having suicidal thoughts and refused medication for depression. (*Id.*) Her physical exam was unremarkable. (*Id.*) Ms. Marr continued Plaintiff's medication, and recommended that Plaintiff diet and exercise. (*Id.*) Ms. Marr instructed Plaintiff to go to the Free Clinic for an orthopedic evaluation. (*Id.*)

---

[7] Plaintiff was provided an application on multiple visits and applied for a patient assistance program. (AR 343, 369, 371-73, 377-79.)

On January 26, 2011, Plaintiff completed an application to receive Cymbalta from the Lilly Cares Patient Assistance Program. (AR 371.) On January 25, 2011, Plaintiff followed up at Potomac Hospital. (AR 369-70.) Plaintiff reported that she was coping well with living in a shelter for the previous two weeks. (AR 369.) She wanted to reorder Cymbalta for her generalized joint pain. (AR 369.) Ms. Marr reported that plaintiff looked good. (*Id.*) Plaintiff's physical exam was unremarkable. (*Id.*) Ms. Marr again urged Plaintiff to diet and exercise. (*Id.*)

On February 8, 2011, Ms. Marr referred Plaintiff to the Free Clinic for evaluation because Plaintiff feared that she may have Parkinson's disease because her hands were shaking. (AR 360, 443.) On February 16, 2011, Plaintiff returned to Potomac Hospital complaining of a skin irritation since she began using a new detergent/soap, and seeking a tetanus shot after she stepped on a nail with her left foot. (AR 354-55.) On April 14, 2011, Ms. Marr informed Plaintiff that her kidneys were fine, but her blood sugar level was high. (AR 345.) Ms. Marr adjusted Plaintiff's insulin. (AR 343.)

Additionally, at Plaintiff's hearing on May 10, 2011, she provided additional subjective testimony regarding her medical condition. (AR 26-56.) At the hearing, she was five feet and one and one-half inches tall, and weighed over 300 pounds. (AR 30.) She attributed her weight gain to the medication that she took for her diabetes. (AR 30-31.) Plaintiff contended that she stopped working because of problems related to her uncontrolled diabetes. (AR 35, 39.) However, Plaintiff acknowledged that she had these same symptoms when she started her child care business. (AR 33.) Plaintiff reported that she did not have health insurance. (AR 38.) She received treatment from the Prince William County Mobile Health Clinic. (AR 29, 38.) The medication that she took helped her pain, but not all the time. (AR 40.) She contended that she

experienced mild side effects (i.e., sleepiness and drowsiness) from her medication. (*Id.*) She denied exercising, but she admitted that her physicians had told her to exercise. (AR 46.) She indicated that her physician(s) had not placed any restriction on her activities. (*Id.*) Additionally, she acknowledged that an inhaler controlled her asthma symptoms. (AR 39.) She also testified that she took Tylenol PM or Benadryl to help her sleep at night and took Cymbalta for her depression symptoms, but did not see a psychiatrist. (AR 38, 44.)

Upon review of the aforementioned evidence, the ALJ came to a final determination. (AR 20.)

### III.   PROCEDURAL BACKGROUND

#### A.   Determining Disability Pursuant to the Sequential Analysis

To qualify for SSI under § 1382 of the Act, a person under age sixty-five must be disabled and meet income requirements. 42 U.S.C. §1382(a). For this purpose, the Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). To meet this definition, the claimant must have a "severe impairment" that makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

The Commissioner utilizes a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4); *see Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). Specifically, the ALJ must consider whether the claimant: (1) is engaged in substantial

gainful activity;[8] (2) has a severe impairment; (3) has an impairment that equals a condition contained within the SSA's official listing of impairments;[9] (4) has an impairment that prevents past relevant work;[10] and (5) has an impairment that prevents him from any substantial gainful employment.[11] *See id.*

## B.    ALJ's Findings

Utilizing the sequential analysis, the ALJ proceeded through each step and rendered two adverse findings. First, the ALJ found that Plaintiff met the insured status requirement through December 31, 2011, and had not engaged in substantial gainful activity since March 15, 2007, the alleged disability onset date. (AR 13.) Second, the ALJ concluded that Plaintiff suffered from the following severe impairments: "diabetes, obesity, asthma, osteoarthritis, degenerative disc disease, and hypertension." (AR 13.) After reviewing Plaintiff's extensive medical history, the ALJ stated that "the claimant has visited numerous physicians and undergone various treatments without improvement." (AR 14.) However, when considering step three of the sequential analysis, the ALJ determined that these impairments did not meet or medically equal

---

[8] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity "involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[9] If the impairment meets or equals in severity an impairment in the listings, disability is conclusively presumed; if not, the analysis proceeds to step four. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[10] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a) & 404.1565(a).

[11] The burden of proof shifts slightly to the Commissioner at this stage, requiring the Commissioner to provide evidence of a significant number of jobs in the national economy that the plaintiff could perform based on the plaintiff's age, education, work experience and residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v); *see Wells v. Barnhart*, 296 F. 3d 287, 290 (4th Cir. 2002) (citing *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2006)).

one of the listed impairments contained within the SSA's official listing of impairments.[12] (AR 15.) The ALJ concluded that Plaintiff's impairments did not meet or medically equal the evidence to demonstrate that the claimant has a disorder of the spine, inflammatory arthritis, diabetes mellitus, or obesity that has impaired relevant systems pursuant to said official listing of impairments. (AR 15-16.) When considering step four of the analysis, the ALJ concluded that Plaintiff is unable to perform any past relevant work.[13] (AR 19.) Finally, when considering step five,[14] the ALJ found that Plaintiff has the residual functional capacity to perform sedentary work.[15] (AR 17.) The ALJ concluded that Plaintiff

> can occasionally climb stairs and ramps, balance, bend, stoop, kneel, and crouch. She should never climb ropes, ladders, and scaffolds, and crawl. She can occasionally perform overhead reaching and feeling with her non-dominant left hand. She should avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, and hazards such as moving machinery and unprotected heights. She should avoid driving.[16] She has moderate limitations in the ability to concentrate, maintain attention for extended periods, and keep up a pace, due to pain, fatigue, and effects of medication.

(*Id.*)

Thus, based on Plaintiff's functional limitations, the ALJ concluded that, considering Plaintiff's age, education, work experience, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (AR 19.)

---

[12] The listed impairments referred to are: 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 & 416.926.

[13] The ALJ noted that Plaintiff's past relevant work is that of a childcare provider and that Dr. Ryan, an impartial vocational expert, testified at Plaintiff's hearing that due to Plaintiff's residual functional capacity, Plaintiff is unable to perform her past relevant work. (AR 19.)

[14] The ALJ's findings here are relevant to the adverse findings at both steps three and step five.

[15] Such sedentary work is as defined in 20 CFR §§ 404.1567(a) & 416.967(a).

[16] The ALJ found that Plaintiff should avoid driving, although she has no license.

As a result of the ALJ's determination that Plaintiff's impairments did not amount to one of the listed impairments, and that jobs existed in significant numbers in the national economy that Plaintiff can perform, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (AR 26.)

## IV.   ANALYSIS

### A.   Standard of Review

Plaintiff's failure to file a motion for summary judgment and failure to respond to Defendant's Motion for Summary Judgment, pursuant to the Agreed Order (Dkt. No. 14),[17] alone, does not fulfill the burdens imposed on moving parties by Rule 56(c). Fed. R. Civ. P. 56(c). Although a party's failure to respond to a summary judgment motion may leave facts established by the moving party uncontested, failure to respond by itself does not warrant the court granting default summary judgment. *See Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). The moving party must still show that such facts entitle the party to "a judgment as a matter of law." *See id.; see also* Fed. R. Civ. P. 56(e).

The standard of review for the instant case is established by 42 U.S.C. § 405(g) which states that the findings of the Acting Commissioner are conclusive so long as such findings are supported by substantial evidence. Substantial evidence has been defined as "more than a scintilla," but "less than a preponderance" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Acting Commissioner has the duty to make findings of fact and resolve conflicts in the evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)); *see also Underwood v. Ribicoff*, 298 F.2d 850,

---

[17] This Court issued an agreed order that: Defendant file an answer and the administrative record on March 19, 2013; Plaintiff file a motion for summary judgment on May 20, 2013; and Defendant file an opposition to Plaintiff's motion combined with Defendant's cross motion for summary judgment on June 21, 2013. (Dkt. No. 14.)

851 (4th Cir. 1962) (stating if such findings are supported by substantial evidence, the courts are bound to accept them). Upon judicial review of a claim, the court has a duty to "scrutinize 'the record as a whole' to determine whether the conclusions reached are rational." *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951); *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). Judicial review of a final decision regarding disability benefits is "limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *See Hays*, 907 F.2d. at 1456; *see also Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1990). In determining whether findings are supported by substantial evidence, the court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the agency." *See Mastro*, 270 F.3d at 177.

### B.   Defendant's Motion for Summary Judgment

The Plaintiff failed to file a Motion for Summary Judgment or any reply to Defendant's Motion for Summary Judgment pursuant to the Agreed Order. (Dkt. No 14.) Defendant seeks summary judgment on the ground that the ALJ's decision is supported by substantial evidence, and therefore, should be affirmed. Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment focuses on two assertions: (1) that the Acting Commissioner employed the correct legal standards in reaching his decision, and (2) that Plaintiff is not disabled within the meaning of the Act. (Dkt. No. 16 at 2.) Therefore, because these are the only issues presented to the Court, the undersigned will address each of Defendant's assertions in turn.

### 1.   Application of the Legal Standard

Defendant asserts that the five-step sequential evaluation process is the applicable law in this judicial district regarding determination of a plaintiff's disability. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Court concludes that the ALJ followed the correct five-step sequential analysis to determine whether a claimant is disabled. In analyzing social security benefits, "[d]etermination of eligibility for social security benefits involves a five-step inquiry." *Mastro*, 270 F.3d at 177; *see also Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). The ALJ considered all five steps of the sequential test, considering whether Plaintiff: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that equals a condition contained within the SSA's official listing of impairments; (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment. 20 C.F.R. § 416.920(a)(4); *see Walls*, 296 F.3d at 290.

Because the ALJ applied the correct legal standard to this case, the undersigned finds that the ALJ did not err in applying the applicable law.

### 2.  Plaintiff's Ability to Perform Substantial Gainful Activity

Generally, in assessing a plaintiff's ability to engage in any substantial gainful activity, four elements are assessed:

> (1) the objective medical facts, which are the clinical findings of treating or examining physicians divorced from their expert judgments or opinion as to the significance of these clinical findings, (2) the diagnoses, and expert medical opinions of the treating and examining physicians on subsidiary questions of fact, (3) the subjective evidence of pain and disability testified to by [Plaintiff], (4) [Plaintiff's] educational background, work history, and present age.

*Underwood*, 298 F.2d at 851. In assessing these four elements, "the fact finder must recognize the obvious interrelation of these elements of proof." (*Id.*) Although objective medical findings "may show more or less clearly the existence of certain clinically determinable physical or mental impairments," the plaintiff's ability to engage in any substantial gainful activity is not to be solely based on medical opinion evidence; medical opinion evidence itself is without weight. (*Id.* citing *United States v. Spaulding*, 293 U.S. 498, 506 (1934) (deeming the principle laid

down in *Spaulding* equally applicable to an administrative finding)). Finally, the first three elements alone will not conclusively determine whether the plaintiff is disabled within the meaning of the Act; rather, even if severe physical limitation is found, "it is still necessary in applying the legal standard to relate this limitation to the [plaintiff's] work history and educational background." *See Butler v. Flemming*, 288 F.2d 591 (5th Cir. 1961).

### a.    Objective Medical History and Plaintiff's Subjective Testimony

Overall, allegations of subjective symptoms must be supported by objective medical evidence. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); SSR 96-7p, 61 Fed. Reg. at 34486-34487. A plaintiff's treatment history is an equally important indicator of the intensity and persistence of her symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv)-(vi), 416.929(c)(3)(iv)-(vi); *see also* SSR 96-7p, 61 Fed. Reg. at 34487. A plaintiff's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports of record show that the plaintiff is not following the treatment as prescribed and there was no good reason for this failure. *See* SSR 96-7p, 61 Fed. Reg. at 34487. Even if a plaintiff is unable to afford treatment, the adjudicator will consider whether the plaintiff has access to free or low cost medical services. *Id.*

First, the ALJ examined the objective medical evidence. The ALJ found that the medically acceptable laboratory diagnostic techniques and acceptable clinical findings suggested that Plaintiff was not as limited as she alleged. The ALJ observed that Plaintiff's diagnostic studies revealed only degenerative changes in her lumbar spine. The ALJ found that there was no evidence that these degenerative changes had caused a compromise of her nerve root. The ALJ observed that Plaintiff's hip x-ray showed no acute process. Plaintiff's x-rays also revealed

no focal lytic lesion, and her joint spaces were symmetrical. Plaintiff's most recent chest x-ray revealed no evidence of an acute cardiopulmonary disease. Plaintiff's lungs were clear; her cardiomediastinal silhouette was unremarkable; and she had no significant osseous abnormalities. Additionally, the ALJ considered Plaintiff's obesity and acknowledged that it had affected her osteoarthritis, diabetes, and hypertension. The ALJ found that Plaintiff's weight-bearing joints were severely impacted by her weight. However, Plaintiff's obesity had not impaired other body systems, such as her musculoskeletal or cardiovascular system, to the extent that she was incapable of working. Plaintiff's gait was steady, and her motor exams and strength were essentially intact in her upper and lower extremities. She had good range of motion of her shoulders, elbows, knees, ankles, wrists, and fingers. She did not have an acute cardiovascular process. The ALJ further found that the medical evidence did not indicate that Plaintiff had an ongoing acute process due to her asthma. Accordingly, the ALJ reasonably found that the medical evidence did not suggest that Plaintiff was as restricted as she alleged.

Second, the ALJ examined Plaintiff's treatment history. The ALJ observed that Plaintiff never required more than conservative treatment. Plaintiff had not required inpatient hospitalization or ongoing emergent treatment for her musculoskeletal condition, diabetes, or asthma. The ALJ observed that physical therapy was never prescribed and surgery was never discussed. The ALJ further observed that Plaintiff's asthma and hypertension were controlled by medication. While Plaintiff's diabetes was sometimes under control, the record revealed that she had a history of non-compliance with medical advice for her diabetes such as missing her medication, allowing her medication to run out before refill, or not following her diet. The ALJ considered Plaintiff's statement that she lacked health insurance. But the ALJ noted that Plaintiff received food stamps and was aware of her ability to receive public health assistance

22

such as medication assistance and treatment at a Free Clinic. Outside of medication assistance and seeking treatment from a mobile clinic, the ALJ found that the record did not indicate that Plaintiff sought public health assistance. Finally, the ALJ found that the record indicated that Plaintiff's depression had not significantly impacted her ability to perform basic work activities because she had never received treatment from a psychologist or psychiatrist and had declined medication for treatment of depression.

Finally, the ALJ took into account Plaintiff's own testimony about her capabilities where she acknowledged that her condition had not affected her memory, completing tasks, concentration, attention, understanding, following instructions, getting along with others, and handling changes in routine. In assessing Plaintiff's residual functional capacity, the ALJ carefully considered the entire administrative record, including assessing the intensity, persistence, and functionally limiting effects of her alleged symptoms. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms that she alleged. However, after the ALJ considered Plaintiff's statements made in light of the requirements of 20 C.F.R. §§ 404.1529, 416.929 and Social Security Ruling ("SSR") 96-7p, the ALJ determined that her assertions regarding the intensity, persistence, and limiting effects of her symptoms were not credible because of the inconsistencies in comparison with her residual functional capacity.

Moreover, the ALJ observed that Plaintiff had visited numerous physicians and undergone various treatments. The ALJ found that the weight of the medical opinion evidence revealed that Plaintiff could perform a range of sedentary work, which coincided with her credible subjective complaints. The ALJ found, further, that Plaintiff's longitudinal treatment history revealed that her statements could not wholly be believed and accepted as true. Thus, as

described above, there is substantial evidence in the Record to conclude that the ALJ appropriately considered the objective medical facts and subjective evidence given by Plaintiff in determining Plaintiff's ability to perform substantial gainful activity.

### b.   Medical Opinion Evidence

In evaluating the intensity and persistence of Plaintiff's symptoms, the ALJ was required to consider the medical opinion evidence. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); SSR 96-7p, 61 Fed. Reg. at 34486. The ALJ noted that three physicians concluded that Plaintiff could perform a range of sedentary work.

First, Dr. Young concluded that Plaintiff could perform a wide range of light work that was more physically demanding than the work that her residual functional capacity defined. Dr. Young also observed that Plaintiff's asthma was controlled with medication. Plaintiff exhibited no wheezes, rhonchi or rales, and her cardiac exam revealed a regular rate and rhythm with no murmurs, rubs or gallops on auscultation. She had no peripheral artery disease. The range of movement of her shoulders, elbows, wrists, fingers, knees, and ankles was normal. She had 5/5 muscle and grip strength, intact manual dexterity and reflexes. Her straight leg-raising test was negative. Moreover, Dr. Young found that Plaintiff did not need to use an assistive device. Finally, Dr. Young observed that Plaintiff carried a "very heavy" purse that weighed at least ten to fifteen pounds.

Next, Drs. Amos and Vinh, medical consultants who reviewed Plaintiff's record for the State agency, also concluded that Plaintiff could perform a wide range of light work.[18] Dr. Vinh noted that Plaintiff's asthma was controlled with medication, and that Plaintiff had a history of non-compliance with medical advice for her diabetes. Finally, although Plaintiff was obese and complained of joint pain, Dr. Vinh observed that she was able to move about and use her arms

---

[18] Dr. Vinh's opinion is the most recent, being issued in May 2010.

and hands in an effective manner. Although Drs. Amos and Vinh were physician consultants who worked with the State agency, the ALJ noted that Drs. Amos and Vinh were qualified physicians to evaluate Social Security disability. Regarding all three doctors testimony, the ALJ concluded that Plaintiff could do the lesser demands of sedentary work.

The ALJ assigned greater weight to Drs. Amos' and Vinh's opinions because they were generally consistent with the medical record and clinical finding. (AR 18, 303, 326, 330.) The medical opinion of a non-examining physician, such as those from Drs. Amos and Vinh, may be relied upon to assert the denial or allowance of a claim where the opinion is consistent with the medical findings of record. *See Smith v. Cohen*, 795 F.2d 343, 346 (4th Cir. 1986); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1985); *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971). Thus, the Court concludes that there is substantial evidence that the ALJ appropriately considered medical opinion evidence in determining Plaintiff's ability to perform substantial gainful activity.

### c.    Vocational Ability

A vocational expert's opinion must be based on more than just Plaintiff's testimony; rather, it should be based on Plaintiff's condition as gleaned from the entire record. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). For a vocational expert's testimony to be relevant, or helpful, it must be based upon consideration of the entire record and must be in response to a proper hypothetical question that fairly sets out all of Plaintiff's impairments, which were supported by the objective medical evidence. *See id.*

Here, the ALJ posed a hypothetical question to the vocational expert that reflected each of Plaintiff's impairments that were supported by the objective medical findings in the record. In response, the vocational expert advised that someone like Plaintiff could perform 25% of the 200

unskilled sedentary occupations recognized in the medical vocational guidelines, such as charge account clerk and security worker. The ALJ explained that a "moderate limitation" meant no more than a slight limitation, with an overall ability to function satisfactorily. Although the ALJ did not ask the vocational expert to consider someone who had a moderate limitation in her ability to concentrate and maintain attention for extended periods when asking said hypothetical, such omission does not warrant remand. *See NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)) (clarifying that "where remand would be an idle and useless formality, courts are not required to "convert judicial review of agency action into a ping-pong game."). As such, remand is not warranted in this case because upon review of the entire record, substantial evidence supports the vocational expert's determination of Plaintiff's ability to participate in substantial gainful activity.

In total, this Court finds that the ALJ appropriately weighed the objective medical facts, the medical opinion evidence, the subjective evidence by Plaintiff, and Plaintiff's education, work history, and age in arriving at his ruling. Thus, this Court's role is not to weigh the conflicting evidence or substitute its judgment for that of the ALJ. Based on the Court's thorough review of the entire record and the ALJ's decision, this Court finds that the ALJ properly reviewed the totality of the record and relied on substantial evidence in arriving at the residual functional capacity assessment. In undertaking this review, the Court concludes that the ALJ's decision is supported by substantial evidence, and summary judgment should be granted in favor of Defendant.

## V.   **CONCLUSION**

Based on the Court's thorough review of the entire record and the ALJ's decision, this Court finds that the ALJ applied the applicable legal standard and properly reviewed the totality

of the record and relied on substantial evidence in arriving at the conclusion that Plaintiff is not disabled within the meaning of the Act. For the foregoing reasons, the Court finds that the ALJ's decision does not contain legal error and is supported by substantial evidence. Therefore, the Motion for Summary Judgment by Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security, shall be granted. An appropriate Order will follow.

_____ /s/
Ivan D. Davis
United States Magistrate Judge

November 29, 2013
Alexandria, Virginia

27